# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA

'04   SEP 28   ?4:2?   **CRIMINAL COMPLAINT**

v.

CASE NUMBER: 04 - m - 762

HAILIN LIN (a/k/a Lin Hailin) (d/o/b 4/28/49),
NING WEN (a/k/a Wen Ning) (dob 4/12/49),
JIAN GUO QU (a/k/a Qu Jian Guo) (d/o/b 9/30/59) and
RUO LING WANG (a/k/a Wang Ruo Ling) (d/o/b 5/14/69).

I, Joel R. Christy, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief. **Count One:** Beginning at least by September 2001, and continuing thereafter until the present, in the State and Eastern District of Wisconsin and elsewhere, Hailin Lin (a/k/a Lin Hailin), Ning Wen (a/k/a Wen Ning), Jian Guo Qu (a/k/a Qu Jian Guo), and Ruo Ling Wang (a/k/a Wang Ruo Ling), the defendants herein, did knowingly conspire to commit violations of Title 50, United States Code § 1705(b) (IEEPA, International Emergency Economic Powers Act), and 15 C.F.R. 764.2(a) (the Export Administration Regulations), and Hailin Lin committed acts in furtherance of such conspiracy and to effect its objects, including causing export controlled commodities to be shipped to the People's Republic of China without obtaining the necessary license from the Department of Commerce on or about July 27, 2004; all in violation of Title 18, United States Code, Section 371. **Count Two:** Beginning at least by May 2004, and continuing thereafter until the present, in the State and Eastern District of Wisconsin and elsewhere, Hailin Lin (a/k/a Lin Hailin), Ning Wen (a/k/a Wen Ning), Jian Guo Qu (a/k/a Qu Jian Guo), and Ruo Ling Wang (a/k/a Wang Ruo Ling), the defendants herein, did knowingly conspire to transport, transmit and transfer monetary instruments and funds from the People's Republic of China and Hong Kong to a place in the United States with the intent to promote the carrying on of specified unlawful activity that is: violations of Title 50, United States Code § 1705(b) (IEEPA, International Emergency Economic Powers Act), all in violation of 18 U.S.C. § 1956(a)(2)(A); and Jian Guo Qu committed acts in furtherance of such conspiracy and to effect its objects, including causing approximately $49,967.16 to be wired from Ms Tsui Kan, Hong Kong, to the bank account of Wen Enterprises located at Associated Bank, Manitowoc, Wisconsin; all in violation of Title 18, United States Code, Section 1956(h).

I further state that I am a Special Agent assigned to the Chicago Field Office (CHFO), Office of Export Enforcement (OEE), Bureau of Industry and Security (BIS), United States Department of Commerce (USDOC). and this complaint is based on the following facts:

Please see the attached affidavit.
Continued on the attached sheet and made a part hereof:      X Yes ___ No

Signature of Complainant
JOEL R. CHRISTY

Sworn to before me and subscribed in my presence,

September   28 , 2004
Date

at Green Bay, Wisconsin
City and State

The Honorable James R. Sickel,
United States Magistrate Judge
**Name & Title of Judicial Officer**

Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT APPLICATIONS, SEIZURE WARRANT, AND CRIMINAL COMPLAINT

Joel R. Christy, being duly sworn, does hereby depose and state:

### A.    INTRODUCTION

1.    I am a Special Agent assigned to the Chicago Field Office (CHFO), Office of Export

Enforcement (OEE), Bureau of Industry and Security (BIS), United States Department of

Commerce (USDOC). I have been a Special Agent with OEE since September 1998 and have a

total of fourteen years in a Federal Law Enforcement position. I received Basic Criminal

Investigator Training at the Federal Law Enforcement Training Center (FLETC), Glynco, GA. I

have attended several export and specialty training seminars addressing United States export

controls involving national security and other issues. I have conducted and participated in

numerous investigations of violations of United States export laws. As a result of my training

and experience, I am familiar with federal laws relating to the unlawful exportation of goods and

technology.

2.    This affidavit is made in support of a criminal complaint for Hailin Lin (a/k/a Lin Hailin),

Ning Wen (a/k/a Wen Ning), Jian Guo Qu (a/k/a Qu Jian Guo), and Ruo Ling Wang (a/k/a Wang

Ruo Ling), for a violation of Title 18, United States Code, Section 371, conspiracy to violate

Title 50, United States Code, § 1705(b), (willfully violating an executive order issued under

IEEPA, for the illegal exportation of electronic components), 18 U.S.C. § 1956(h) (conspiracy to

violate Title 18 U.S.C. § 1956 (money laundering)), and violations of Title 18 U.S.C. §

1956(a)(2)(A) (money laundering).

3.    This affidavit is also made in support of a search warrant for the residence of Ning Wen

and Hailin Lin, which residence is also the business office of the Wen Enterprises and is located

at 402 Wild Oak Drive, Manitowoc, Wisconsin, 54220, and a safe deposit box (#2779) rented by Ning Wen and Lin Hailin, located at Associated Bank, 1000 Franklin Street, Manitowoc, Wisconsin. Probable cause exists to believe that at these locations, evidence or proceeds of the crimes of illegal exportation of electronic components will be found, in violation of Title 50, United States Code § 1705(b), IEEPA, International Emergency Economic Powers Act, and the Export Administration Regulations, codified at 15 C.F.R. Parts 730-774 and money laundering, in violation of Title 18 United States Code, Section 1956. This affidavit is submitted in support of an application for search warrants to seize the items found in Attachment A.

4.      This affidavit is also submitted in support of a seizure warrant for the business checking account held in the name of Wen Enterprises, account number 2203003690, located at Associated Banc-Corp, Manitowoc, Wisconsin.

5.      I am thoroughly familiar with the information contained in this affidavit based upon my personal observations and my general investigation of this matter as well as my discussions with other law enforcement agents and witnesses and my review of documents. Since this affidavit is submitted for the limited purpose of obtaining a criminal complaint, two search warrants, and a seizure warrant, I have not included each and every detail that I have learned during this investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause for the search and seizure warrants sought herein. Where the content of documents and the actions, conversations and statements of others are set forth herein, they are related in substance and in part only. Most of the conversations recounted in this affidavit were originally in Mandarin Chinese. The conversations have been transcribed by certified interpreters, whom I believe to be truthful and reliable.

2

## B. BACKGROUND OF INVESTIGATION

6. The Federal Bureau of Investigation, the U.S. Department of Commerce, Office of Export

Enforcement, the U.S. Bureau of Immigration and Customs Enforcement (BICE), and the

Internal Revenue Service Criminal Investigation, are currently investigating Ning Wen ("Wen"),

Hailin Lin ("Lin"), Jian Guo Qu ("Qu"), Ruo Ling Wang ("Wang'), and Xiao Qing Zhou

("Zhou"), as well as their businesses, Wen Enterprises and Beijing Rich Linscience Electronic

Company, Ltd. ("BRLE"). Investigation to date has included use of subpoenas to banks,

electronic component suppliers, shipping companies, the use of court-ordered pen register and

trap and trace devices, use of 2703(d) orders, physical surveillance, witness interviews and use of

court authorized electronic surveillance.

7. The investigation has revealed that the subjects are using their respective businesses to

illegally transfer sensitive, national-security controlled items to the People's Republic of China

("PRC" or "China") without obtaining required export licenses. (These items are referred to

herein as "controlled commodities.") The controlled commodities the subjects are illegally

exporting can be used in a wide variety of military radar and communication applications.

## C. DESCRIPTION OF THE LOCATIONS TO BE SEARCHED

8. This affidavit is submitted in support of an application for a search warrant to search the

residence of Ning Wen and Hailin Lin, which residence is also the business premises of Wen

Enterprises (hereinafter subject premises). This location is more particularly described as

follows:

> 402 Wild Oak Drive, Manitowoc, Wisconsin, more specifically described as lot
> 10, block 8, Woodridge Estates subdivision number 3, a single-family, one story
> residence, covered in beige stucco with a brown roof. The residence is located on

3

the north side of Wild Oak Drive and is the last residence before the street dead ends. The numbers "402" are arranged vertically on a white lamppost in the front yard. The front door is light in color and is behind an outer glass storm door. The residence has two chimneys visible from the street and an attached three-car garage. On the northeast corner of the lot there is a small shed, which is the same color as the residence.

9. In addition, this affidavit is submitted in support of an application for a search warrant to search a safe deposit box held in the names of Ning Wen and Hailin Lin, located at Associated Bank, 1000 Franklin Street, Manitowoc, Wisconsin.

## D. BACKGROUND OF SUBJECTS AND THEIR COMPANIES

10. A review of Ning Wen's Immigration and Naturalization Service ("INS") file shows that he was born on April 12, 1949, in Shanghai, People's Republic of China ("PRC" or "China"). Wen was educated at Qing Hua University, Beijing, PRC, from 1972 until 1976 and obtained a bachelor of science in thermal engineering. Wen attended Shanghai Jiao Tong University in the PRC from 1978 until 1980. From 1980 until 1984, he attended the University of California at Berkeley where he received a Ph.D. in heat transfer. Beginning in 1986, Wen was employed by the PRC at Chinese consulates in the United States, first in San Francisco and later in Los Angeles. Wen was employed as a State Science and Technology Commission officer.

11. In 1989, Wen was recruited and worked for the FBI as an informant while still employed at the PRC Consulate in Los Angeles. Wen worked for the FBI from October 1989 until March 1992, when he terminated his employment with the PRC Consulate in Los Angeles at the end of his US tour. After terminating his employment at the PRC Consulate, Wen continued to provide information to the FBI.

12. In 1991 or 1992, Ning Wen is believed to have established Wen Enterprises in California

4

as a business which exports technology.[1] In 1993, Wen began working for The Manitowoc

Company in Manitowoc, Wisconsin. Shortly thereafter, he and his wife, Hailin Lin, moved to

Manitowoc. Wen is currently the President and General Manager of Manitowoc (China) Ltd, a

division of The Manitowoc Company. According to information provided by Wen himself,

which has been verified by Immigration and Customs records, Wen spends approximately 10

months of every year in the PRC. He returns to the United States approximately three to four

times a year for two to three weeks at a time. Wen last arrived in the United States on September

20, 2004, and is expected to return to the PRC on or about October 13, 2004. Ning Wen became

a naturalized United States citizen on or about July 31, 2000.

13.     From March 1994, until February 2001, Wen's primary contacts at the FBI were in the

Milwaukee, Wisconsin office. In February 2004, the FBI officially ended its relationship with

Wen.

14.     Hailin Lin is the wife of Ning Wen. She was born April 28, 1949, in Guangdong, PRC.

She resides at the subject premises throughout the year. According to documents obtained from

the Bureau of Immigration and Customs Enforcement, approximately once per year Lin returns to

the PRC to visit. Lin became a naturalized U.S. citizen on July 25, 2001. In 1993, when Wen

and Lin purchased their first home in Manitowoc, Wen reported to the mortgagee that Hailin Lin

had been self-employed at Wen Enterprises for two years (since 1991).

---

[1] According to the Dun & Bradstreet report, Wen Enterprises was established in 1992 and is currently located at 402 Wild Oak Drive, Manitowoc, Wisconsin. Ning Wen is listed as the owner of the company. The line of business is listed as wholesale and exports of semiconductor products and consulting services.

5

15.     Jian Guo Qu is a male citizen and resident of the PRC,[2] who was born September 30,

1959. Qu is employed at Beijing Rich Linscience Electronic Company, Ltd. Qu has traveled to

the United States in the past, including in September 1996, January 2001, December 2001, and

April 2004. On his visa applications, Qu lists the purpose of his visits as "temporary visitor" for

either business or pleasure.

16.     Ruo Ling Wang is a female citizen and resident of the PRC,[3] who was born May 14,

1964. Wang is believed to be the wife of Qu. Wang is also employed at Beijing Rich Linscience

Electronic Company, Ltd. Wang has traveled to the United States in the past, including in

October 1993, September 1996, January 2001, and April 2004. On her visa applications, Wang

lists the purpose of her visits as "temporary visitor" for either business or pleasure.

17.     Qu and Wang will be visiting Wen and Lin at their residence at 402 Wild Oak Dr,

Manitowoc, Wisconsin, arriving on or about September 30, 2004 and departing, with Wen and

Lin for Rapid City, South Dakota on about October 3, 2004. Qu and Wang plan to visit Buffalo,

New York; Detroit, Michigan; and Chicago, Illinois before arriving in Manitowoc. Lin made the

airplane reservations for flights within the United States (US) and paid for these flights with her

credit card. Lin also arranged for the hotel rooms in the US for Qu and Wang.

18.     Sometime prior to September, 2001 and continuing until the present, defendants Wen,

---

        [2] One of Qu's travel visas indicates that he is a Mauritanian citizen. However, the
passport number is the same as that used on one of his other visits to the United States.
Therefore, the Mauritanian citizenship is believed to have been erroneously entered into the U.S.
Immigration database upon his arrival in the U.S.

        [3] Similar to Qu, one of Wang's travel visas indicates that she is a Mauritanian citizen.
However, the passport number is the same as that used on one of her other visits to the United
States. Therefore, the Mauritanian citizenship is believed to have been erroneously entered into
the U.S. Immigration database upon her arrival in the U.S.

6

Lin, Qu, and Wang agreed to export controlled commodities to the PRC without the required export licenses. Lin uses the business name of Wen Enterprises when exporting these items. All items shipped by Wen Enterprises are sent to Beijing Rich Linscience Electronic Company, Ltd. (BRLE), which is currently located at #2 Zhong Guan Cun South Avenue, Cyber Mode, Room 1001, Haidian District, Beijing, PRC. Based on a fax recovered from the trash at the subject premises, it is believed that BRLE has also been operating since at least 1994, possibly as part of a "joint venture" with Wen Enterprises.

19.     Qu and Wang are two of Lin's primary contacts at BRLE. Lin is also believed to communicate with a third individual, Zhou, at BRLE.

20.     Based on a review of faxes and telephone calls, as well as records received from suppliers and shipping records, Wen Enterprises and BRLE appear to have a standardized method of doing business. In a given week, Lin would typically receive numerous requests for a price quotations of semi-conductors and other electronic components from Wang, Qu or Zhou. Some of these parts are export controlled commodities, others are not. Lin would obtain price quotes for these items from U.S. manufacturers or suppliers. Lin relayed these price quotes to Wang, Qu and Zhou at BRLE. These prices typically included a 20% markup, which reflected a profit to Wen Enterprises.

21.     According to the investigation to date, Wang, Qu or Zhou would communicate these prices to the "end users" in China, who placed orders for these items. Wang, Qu, and Zhou then communicated the orders to Lin, via facsimile or telephone call. Lin, in turn, placed orders for these electronic components with the U.S. suppliers and manufacturers. Lin requested that the electronic components all be shipped directly to her at the subject premises.

7

22.     Lin would repackage the components that had been shipped to her in a given week into a single box. Lin would bring another individual, Qing Qing, to the subject premises to assist her in repackaging the components. If the size of a shipment was too large, Lin would divide the items into two packages and ship the packages via separate commercial shippers. Lin then informed Qu and Wang, via facsimile, of which parts were being shipped. Qu would respond to Lin's fax with shipping directions, including directions to falsify prices or leave certain commodities off the invoice provided to the shipping company.[4]

23.     Following Qu's directions, Lin would prepare a false invoice for the shipping company, often UPS. Lin then faxed Qu and Wang the false invoice, as well as a real invoice, which included the correct prices of the electronic components and a complete inventory of all the items contained in the box. Lin also included a ongoing balance owed to Wen Enterprises by BRLE for the parts shipped.

24.     BRLE, primarily through Qu, arranged for money to be wired to the Wen Enterprises bank account as payment for these electronic components and export controlled commodities. The money, however, did not come from BRLE, but instead from a company called China National Packaging Base Construction Co, which company is located in China, and/or from an individual, Ms Tsui Kan, located in Hong Kong.

25.     A review of bank records shows that since January 2002, Wen Enterprises received approximately $1,907,050 dollars from these entities inside the PRC and Hong Kong. Lin used

---

[4]  It is believed that Lin is directed to falsify invoices to avoid having to file an Shipper's Export Declaration with her shipments. A Shipper's Export Declaration is required if: (a) The value of any individual commodity, technology, or software in the shipment is more than $2,500 USD; (b) an export license or license exemption is required, regardless of the value of the contents of the shipment; or (c) the destination is a controlled territory.

8

these wire transfers to continue purchasing and shipping electronic components, including controlled commodities. Most of the excess money remained in the Wen Enterprises business account, located at Associated Bank, Manitowoc, Wisconsin, although some of this money was transferred to other accounts controlled by Wen and Lin.

## E.    SUMMARY OF THE LAW AND REGULATIONS

26.    The Export Administration Act (hereinafter referred to as "EAA") authorizes the Secretary of Commerce to prohibit or curtail the export of any goods, technology, or software ("items") as necessary to protect the national security, foreign policy, and short supply interests of the United States. The Secretary implements the authority provided by the EAA through the Export Administration Regulations (15 C.F.R. Parts 730-774) (hereinafter referred to as the "EAR").

27.    The EAA is not permanent legislation and during lapsed time periods, the EAR is continued in effect through Presidential Executive Orders under the International Emergency Economic Powers Act (50 U.S.C. § 1701-1706 (1991 and Supp. 1999)) (hereinafter referred to as "IEEPA"). The President, through Executive Order 12924 (3 C.F.R., 1994 Comp. 917 (1995)), extended by Presidential Notices of August 15, 1995 (3 C.F.R., 1995 Comp. 501 (1996)), August 14, 1996 (3 C.F.R., 1996 Comp. 298 (1997)), August 13, 1997 (3 C.F.R., 1997 Comp. 306 (1998)), August 13, 1998 (3 C.F.R., 1998 Comp. 294 (1999)), and August 10, 1999 (64 Fed. Reg. 44101 (August 13, 1999)), invoked his authority under IEEPA to continue the EAR in effect during a lapse of the EAA on August 20, 1994. The EAA was in place on November 13, 2000 (Pub. L. No. 106-508, November 13, 2000) and recently lapsed on August 20, 2001. The President, through Executive Order 13222 of August 17, 2001 (3 C.F.R., 2001 Comp., p. 783

9

(2002)), as extended by the Notice of August 7, 2003 (68 Fed. Reg. 47833, August 11, 2003), and the Notice of August 6, 2004, (69 Fed. Reg. 48763, August 10, 2004), continued the EAR in effect under IEEPA.

28.     The Secretary of Commerce maintains the EAR, which identifies items over which the U.S. Department of Commerce, Bureau of Industry and Security exercises regulatory jurisdiction. Through the EAR, BIS imposes a license or other requirement before an item subject to the EAR may be lawfully exported from the United States or lawfully re-exported from another country. Section 774 of the EAR (15 C.F.R. Part 774) provides for The Commerce Control List (hereinafter referred to as "CCL"). The CCL includes items (commodities, software and technology) subject to the authority of BIS. Individual items within the CCL are identified by an Export Control Classification Number (hereinafter referred to as "ECCN"). The ECCN contains a set of digits and a letter, which identifies the entry and the type of controls associated with the items. Supplement Number 1 to Part 774 of the EAR (15 C.F.R. Part 774) describes ECCN 3A001 as "Electronic components, as follows (see List of Items Controlled)" and 3A002 as "General Purpose Electronic Equipment." One of the reasons for control for ECCN 3A001 and 3A002 is "NS" (National Security). The export license requirement section states that "NS applies to entire entry and that an export license would be required for countries listed in Country Chart column NS 2." The People's Republic of China ("PRC") is one of the countries listed in Country Chart column NS 2. As a result, an export license is required to export any part listed as ECCN 3A001 or 3A002 to the PRC.

29.     A knowing and willful failure to obtain the authorization (license) required by the EAR constitutes a violation of Section 764.2(a) of the EAR (15 C.F.R. 764.2(a)). In addition, Section

10

764.2 states that it is a violation to solicit or attempt a violation, (15 C.F.R. 764.2(c)); , to conspire to violate the section (15 C.F.R. 764.2(d)); to act with knowledge of a violation (15 C.F.R. 764.2(e)); to possess an item with the intent to export it illegally (15 C.F.R. 762.2 (f)); or to misrepresent or conceal facts in connection with the preparation, submission, issuance, use, or maintenance of any export control document (15 C.F.R. 762.2 (g). Criminal penalty provisions are provided for under 50 U.S.C. 1705(b) (the International Emergency Economic Powers Act).

30.    Pursuant to 18 U.S.C. § 1956(a)(2)(A), whoever transports, transmits, or transfers, a monetary instrument or funds to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of specified unlawful activity shall be sentenced to a fine of not more than $500,000 or twice the value of the monetary instrument or funds involved in the transportation, transmission, or transfer, whichever is greater, or imprisonment for not more than twenty years, or both.

31.    According to 18 U.S.C. § 1956(c)(7) the term "specified unlawful activity" includes an offense under section 206 (relating to penalties) of the International Emergency Economic Powers Act, i.e., 50 U.S.C. § 1705(b).

32.    According to 18 U.S.C. § 1956(h), "[a]ny person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

## F.    THE PRC'S MINISTRY OF INFORMATION INDUSTRY ("MII") AND MII's RESEARCH INSTITUTES

33.    United States export laws prohibit the shipping of controlled commodities to the PRC without a license. The PRC nonetheless seeks to obtain controlled commodities and often relies

11

on its defense industry for doing so. A July 2002 Report to the U.S. Congress by the China

Security Review Commission (the "July 2002 Congressional Report") stated in pertinent part:

> China has gone to extensive legal and illegal lengths to target and acquire
> advanced U.S. and Western defense and dual-use technologies. China's military-
> industrial sector still lags significantly behind that of the West, giving the PRC
> PLA [People's Liberation Army] little choice but to continue to rely on the
> imports to close the gap between the strategic requirements and operational
> capabilities. China is using its access to U.S. advanced commercial technology to
> develop advanced systems with a goal of reaching a military capability equaling or
> exceeding those of the United States.

34. The Ministry of Information Industry ("MII") is the PRC's primary defense industrial

organization responsible for both civilian and military electronics and communications

technology. As such, the MII seeks to help China achieve certain defense modernization goals,

by acquiring Restricted Technology, which places both regional and U.S. national security in

jeopardy.

35. Within the MII is the China Electronics Technology Group Corporation ("CETGC").

CETGC is comprised of approximately fifty Member Research Institutes located throughout the

PRC. These institutes research, develop and produce a wide variety of electronics and

communications technology, for both civilian and military use. Each Research Institute may

employ anywhere from several hundred to several thousand people, including engineers,

researchers and production personnel. Typically, each Research Institute, which is referred to by

a number as well as by a commercial name, has a specific area of expertise; the U.S. Defense

Intelligence Agency has identified these specializations.

36. In this case, the investigation has revealed that at least one Research Institute has obtained

controlled commodities through Wen Enterprises and BRLE. This Institute is known as the

12

Communication, Telemetry and Telecontrol Research Institute, also known as the 54th Research Institute. Specialties of the 54th Research Institute include: telephone exchange systems for use by public security forces, switches, antennas, and satellite communications equipment, mobile communications systems, communications jamming equipment, and remote control and telemetering systems.

37.     The DOC/BIS has identified the 54th Research Institute as an entity which poses a potentially unacceptable risk in the development of missiles. Consequently, exports to the 54th Research Institute are subject to even greater licensing restrictions than other exports to the PRC.

38.     The investigation to date has identified at least two other possible end users, the Harbin Institute of Technology and the Beijing Institute of Technology. In addition, calls between the parties have referenced other institutes" or "research institutes" as end users.

## G.     EXPORT VIOLATIONS

39.     The investigation has revealed that the subjects are exporting or causing the export of controlled commodities which, for national security reasons, cannot be shipped to the PRC without the requisite licensing required by United States export laws. Since 2002, law enforcement officers have detected more than 38 such illegal exports by Wen Enterprises to BRLE, valued at more than $500,000. It is believed that BRLE is not the "end user" for the restricted technology, and is instead serving as a broker for other entities in the PRC.

40.     The subjects have used various techniques to conceal their export activities including: (1) falsely describing the commodities on export invoices or failing to describe the commodities on export invoices; (2) failing to notify the shipper that a license was required to ship the goods to the PRC; (3) understating the value of the shipments to avoid having to file Shipper's Export

13

Declarations; and (4) providing false written statements that the purported technology will only be exported in compliance with U.S. laws. The subjects, particularly Lin, are using the subject premises to conduct, and to further their commission of, the specified federal offenses.

### *EAR Violation: SPT Circuits*

41.     As early as 2001, Lin was placed on notice that some of the commodities that she was shipping to China were export-controlled. In September 2001, a U.S. company called Signal Processing Technologies (SPT) determined that Wen Enterprises had shipped one of its circuits to China in violation of the export-control laws and made Lin aware of the violation.

42.     SPT became aware of this violation when a company called CTI [the 54th Research Institute] emailed SPT in May 2001, requesting technical support for a circuit manufactured by SPT. SPT identified the circuit as model SPT7750AIK, which circuit is controlled under ECCN 3A001.

43.     SPT staff was able to determine that this circuit was sold domestically from SPT to Sager Electronics, located in Massachusetts. When questioned about the circuit, Sager Electronics informed SPT that they sold the circuit to Wen Electronics (sic), located in Wisconsin, which telephone and shipping records have confirmed to be the same business as Wen Enterprises.

44.     On September 25, 2001, Hai Lin (Lin) of Wen Electronics contacted SPT to inquire about export controls on their circuits. According to the SPT employee, Lin had been informed by Sager that Wen Enterprises would have to get an export license prior to purchasing SPT's circuits for export. Lin informed the SPT employee that she had "no clue" about export controls or required paperwork. The SPT employee informed Lin that she needed to contact her supplier (Sager) to for assistance with obtaining export licenses.

14

45. Since 2001, Sager has refused to sell any other SPT circuits to Wen Enterprises. Even after being notified of the export restrictions on SPT circuits, Lin has continued to obtain and export SPT Circuits to BRLE, albeit from suppliers other than Sager.

46. Investigation has revealed that Lin exported the following SPT circuits to BRLE in willful violation of the Export Administration Regulations:[5]

| Date of Export | Part Number | Quantity | Cost per Item | Total |
|---|---|---|---|---|
| July 20, 2002 | SPT7760AIK | 4 | $369.00 | $1,476.00 |
| June 27, 2003 | SPT7722SIT | 13 | $37.00 | $481.00 |
| March 14, 2003 | SPT7721SIT | 2 | $34.20 | $68.40 |
| February 10, 2004 | SPT7722SIT | 16 | $34.50 | $552.00 |
| June 6, 2004 | SPT7722SIT[6] | 16 | $34.50 | $552.00 |
| September 3, 2004 | SPT7760AIK | 2 | $595.00 | $1,202.00 |

### *EAR Violation: False Statements of Assurance; Xilinx Parts*

47. Many suppliers of export controlled electronic components require "Statements of Assurance" or "End User Certifications" to be filed before the supplier will provide export controlled commodities to another company. On more than one occasion, Lin has been required to fill out such statements, acknowledging that she will comply with all applicable export laws and regulations. Investigation has revealed that Lin completed these statements in order to obtain the controlled commodities, but then still illegally exported the controlled commodities without

---

[5] License Determinations G037632, G035617 and G031867 have identified SPT's 7722, 7721, and 7760 circuits to be classified as ECCN 3A001, and require an export license from the USDOC before the item can be shipped to PRC.

[6] In addition to the notice provided to Lin by SPT and Sager, Future Electronics also specifically informed Lin on March 23, 2004, that this commodity was export controlled and required an export license prior to being shipped to China.

Case 1:04-cr-00241-WCG    Filed 09/28/04    Page 16 of 38    Document 1

obtaining the necessary license.

48.     In January 2003, Lin was requested to fill out a "Statement of Assurance before an electronics supplier, Avnet, Inc., would provide Xilinx parts to Lin. Xilinx is a manufacturer of electronic components, which Avnet resells. Many Xilinx parts are export controlled commodities.

49.     In this form, Lin was required to acknowledge that the "[s]ale, transfer, consignment, loan or donation of products and/or technology acquired from Avnet Inc. made directly or indirectly outside the United Sates are made in full compliance with applicable export control laws and regulations." Avnet believes that Lin was placed on notice that the reason that this statement of assurance was requested was because of her pending request for Xilinx parts.

50.     After completing this form in February 2003, Lin purchased Xilinx parts from Avnet. Avnet shipped twenty-five (25) Xilinx parts, numbered XQR4013XL-3CB228M, on February 27, 2003. On March 14, 2003, Wen Enterprises exported commodities to BRLE via United Parcel Service (UPS). According to the UPS invoice provided by Lin, twenty (20) of this Xilinx part, which is an export-controlled commodity, were included in the shipment. However, Lin failed to obtain an export license before shipping this commodity to the PRC and failed to inform UPS that this commodity was export controlled.

51.     In addition to the Statement of Assurance which Lin provided to Avnet, Lin has sought the assistance of Qu, Wang and Zhou at BRLE to complete required end-user certification forms. In one such form, BRLE indicated that the "Beijing Institute of Technology" (BIT) was going to be the end-user of the item to be purchased. BRLE used the same address for BIT on that form as it had used on a previous form. However, on that previous form, BRLE listed itself as the

16

end-user. Lin informed BRLE via facsimile that using the same address for two different end users might arouse suspicion, and should not be done. BRLE then changed the form to reflect BRLE as the end-user. Lin submitted the modified form to the parts supplier in order to obtain the requested parts.

52.     Similarly, on June 3, 2004, Lin and Zhou discussed an accelerometer they were attempting to obtain from a company called PCB. Lin had called the PCB representative for a quote and the representative, on his own initiative, made a visit to Lin's home/office. While there, he asked Lin where the product was going to be exported to. As Lin told Zhou, she had to tell the representative that the product was going to China. The representative said that some PCB products required export licensing, but he was not certain if this part did. He advised Lin that she would have to fill out a form called an end-user form. Only after submitting this form could the PCB representative do business with Wen Enterprises. Lin told Zhou that she had sent this form to Zhou's office and read the first part of the form, wherein she was required to "verify the product purchased from PCB will not be applied or diverted to. . . end user in conflict with." Zhou asked if there was any hope of obtaining this part. Lin replied that there was some hope because the company had not said no right away.

### *EAR Violation: Failure to List Items on Shipping Invoices / AD Parts*

53.     Investigation has revealed that when Lin is made aware that a particular commodity is export controlled, she will refrain from buying that particular commodity from the company which informed her of the export control laws. Instead, Lin would obtain the commodity from a different supplier and ship the commodity to China. It is believed that Lin did this to avoid arousing suspicion. In addition, Lin often failed to document the export-controlled parts on the

17

shipping invoices provided to UPS. It is believed that she does so at the direction of Qu or Wang, and to avoid having to inform BICE about the true content of the packages.

54. Future Electronics, a supplier of semi-conductors, has been selling electronic components to Wen Enterprises for more than two years. Since April 2004, Future Electronics has notified Lin via e-mail when a commodity for which she requests a quote is export controlled and would therefore require an export license. Lin has never proceeded to purchase a commodity that is export controlled from Future. Instead, Lin has obtained the commodity from a different supplier and then shipped the commodity to BRLE.

55. For example, on April 21, 2004, Lin requested that Future quote prices to her for five electronic components, including a part numbered: "AD6640AST." On April 27, 2004, the Future representative sent a follow-up e-mail to Lin that stated, "The part that I identified on the April 21st quote (AD6640AST) is controlled under ECCN 3A001."

56. On May 5, 2004, Wen Enterprises purchased twelve (12) items, model number "AD6640AST" on April 22, 2004, and April 23, 2004 from Avnet. On May 1, 2004, Wen Enterprises exported electronic components to BRLE via UPS. Lin described item #23 on that invoice as twelve (12) "AD6640AS." Based on my review of this part and my knowledge of Lin's other activities, I believe that Lin left off the last letter of the part number to avoid listing an export controlled commodity on the UPS invoice.

57. Lin, in filling out the paperwork for this shipment, failed to inform UPS that this commodity was export controlled and required a license to ship to the PRC. In addition, Lin undervalued the price of this item on the UPS invoice from the purchased price of $39.00 to $32.50.

18

58.     In addition to the above-described example, Lin has been notified by Future of at least six other commodities that are export controlled and would require a license to be shipped to the PRC. In each instance, after receiving the notification from Future, Lin purchased the part from another supplier and exported the part to BRLE. Lin, in filling out the paperwork for these shipments, never informed UPS that this commodities were export controlled and required a license to ship to the PRC.

59.     The following table details these transactions:

| Part Number | Date Future Notified Lin of License Requirement | Date Item was Exported by Wen Enterprises to BRLE |
|---|---|---|
| AD9854/PCB | 05-11-2004 | 05-30-2004 (Wen Enterprises Invoice # JS0420) |
| AD9430BSV-170 | 03-23-2004 | 07-27-2004 (Wen Enterprises Invoice # JS0431) |
| AD9410BSQ | 07-23-2004 | 08-09-2004 (Wen Enterprises Invoice # JS0433) |
| AD9236BRU-80 | 08-24-2004 | 09-03-2004 (Wen Enterprises Invoice # JS0438) |
| AD9236BCP-80 | 08-24-2004 | 09-03-2004 (Wen Enterprises Invoice # JS0438) |
| AD9226ARS | 08-24-2004 | 9-17-2004 (Wen Enterprises Invoice #JS0440) |

60.     On July 28, 2004, the package shipped from Wen Enterprises to BRLE on July 27, 2004, was inspected. This package contained the above-described 120 pieces of the export controlled commodity, "AD9430BSV-170." Lin failed to seek the necessary export license before shipping this controlled commodity to the PRC and failed inform UPS that this commodity was export controlled and required a license to ship to the PRC.

61.     Even before this package was shipped, Lin and Zhou discussed the risks associated with exporting this part. Lin worried about the order because it was a large order and an expensive part. Zhou agreed saying there are some problems with the funding. Lin replies, "yeah, not just problems with the funds. How can I say it?" Zhou replies, "Risk. The risk is big." Lin agreed,

19

stating "risk, yeah."

62.    When this commodity was shipped, Lin did not include it on the invoice provided to
UPS, apparently at the direction of BRLE. On July 27, 2004, Lin received written instructions
from BRLE to change part numbers on the shipping invoice. Lin was instructed that if the
commodities numbered AD9430BSV-170, had arrived, Lin should send these items out, but not
write the item on the invoice provided to UPS. However, later in the same fax, Lin was
instructed to write this item number in the middle of the invoice. In fact, Lin omitted these items
entirely from the invoice provided to UPS.

63.    The September 3, 2004, package from Lin to BRLE was also inspected. This shipment
contained four items marked "AD9236BRU-80" and four items marked "AD9236BCP-80," both
of which Lin had been informed were export controlled commodities. Once again, Lin failed to
list these commodities on the invoice provided to UPS. In addition, Lin failed to obtain an
export license or to inform UPS that an export license was required for these commodities.

64.    In addition to failing to list export controlled commodities on shipping invoices, the
subjects have discussed other methods to avoid arousing suspicion. On September 1, 2004, Lin
and Wang discussed a future shipment. Lin told Wang that the "AD 7233" had not arrived yet.
Wang informed Lin that Zhou wanted this part sent out by letter mail, because "letters don't go
through customs."

### *EAR Violation: Misrepresentations to UPS Regarding the Value of Shipments*

65.    In order to avoid the filing of Shipper's Export Declarations, which declarations are
reviewed by BICE, Lin has begun understating the value of shipments to BRLE. Conversations
between Lin and Qu have revealed that Lin undervalues these shipments with the full knowledge

20

of and at the direction of Qu.

66.    On April 1, 2004, Lin shipped a package to BRLE via UPS. Upon review of the value of the items being shipped, UPS informed Lin that an SED would be required for this package. Rather than having UPS fill out an SED for her, Lin requested that the package be returned to her. The following day, Lin made a shipment via DHL shipping service. Lin stated the value of the package to be less than the $2,500. By doing so, she avoided the requirement of filing an SED.

67.    Since April 1, 2004, a review of all shipping invoices provided to UPS or DHL by Lin reflects that the value of the items inside the package is never more than $2,500, and is almost always between $2,400 and $2,500. However, a review of the true invoices faxed to BRLE reflects that the actual value of the shipments was almost always in excess of $2,500.

68.    The following table shows the falsified value of the shipments, as reported to UPS, and the actual value of the shipments, as Lin charged BRLE:

| INVOICE NO. | INVOICE DATE | VALUE AS REPORTED TO SHIPPER | VALUE AS CHARGED TO BRLE |
|---|---|---|---|
| D365-JS0437 | 09-02-2004 | $2,425.40 | $6,338.90 |
| D364-JS0436 | 08-27-2004 | $2,487.80 | $18,785.60 |
| D363-JS0435 | 08-20-2004 | $2,484.00 | $13,847.20 |
| D362-JS0434 | 08-13-2004 | $1,841.40 | $2,561.90 |
| D361-JS0433-D | 08-09-2004 | $2,484.50 | $7,084.20 |
| D361-JS0433 | 08-06-2004 | $2,486.50 | $6,571.80 |
| D360-JS0432 | 07-30-2004 | $2,482.95 | $12,266.50 |
| D359-JS0431 | 07-27-2004 | $2,457.60 | $20,399.90 |
| D358-JS0430 | 07-23-2004 | $2,462.95 | $8,469.30 |
| D357-JS0429 | 07-16-2004 | $2,427.50 | $10,450.20 |
| D356-JS0428 | 07-09-2004 | $2,486.30 | $7,690.80 |
| D356-JS0427 | 07-05-2004 | $1,981.00 | $4,329.90 |
| D355-JS0426 | 07-02-2004 | $2,471.50 | $8,434.80 |
| D354-JS0425 | 06-29-2004 | $2,483.50 | $8,618.10 |

21

| INVOICE NO. | INVOICE DATE | VALUE AS REPORTED TO SHIPPER | VALUE AS CHARGED TO BRLE |
|---|---|---|---|
| D353-JS0424-D | 06-25-2004 | $2,480.00 | $7,600.10 |
| D352-JS0423 | 06-18-2004 | $2,488.00 | $8,225.90 |
| D351-JS0422 | 06-11-2004 | $2,479.40 | $11,187.00 |
| D350-JS0421-U | 06-04-2004 | $2,478.60 | $12,973.30 |
| D350-JS0421-D | 06-04-2004 | $2,463.90 | $3,730.90 |
| D349-JS0420-U | 05-28-2004 | $2,453.40 | $8,530.30 |
| D349-JS0420-D | 05-28-2004 | $2,486.70 | $7,491.80 |
| D348-JS0419 | 05-21-2004 | $2,469.60 | $11,328.70 |
| D346-JS0417 | 05-05-2004 | $2,363.80 | $8,552.05 |

69.     It is believed that Lin falsified the value of the items with the knowledge and consent of

Qu. On July 15, 2004, Qu and Lin discussed falsifying shipping documents so as to avoid law

enforcement detection. Qu told Lin not to write down every part number on the invoices for the

shippers. Lin replied that every week, there are many items that she doesn't write down. Qu

cautioned that there shouldn't be too many items left out though, because he is afraid that if the

box is searched and there are numerous items not included on the invoice, it will "appear to be

intentional rather than unintentional." Qu instructed Lin that she should leave out only those

items that are easily overlooked if boxes are searched. Qu stated that as long as a value of $2,500

is not exceeded, it is OK. Lin replied, "Yeah. I make a number every time." Qu laughed and Lin

continued, "Actually, every time when all the items are added together, it [2500] will definitely

be greatly exceeded." Qu later cautioned Lin not to make the value around 2400 every time

because after an extended period of time, "Customs will always find things that have a pattern

and will cause us trouble."

70.     Similarly, a fax recovered on April 28, 2004, from the trash at the subject premises

residence revealed instruction from Qu, signed as "Qu," to Lin, addressed as "Mrs. Wen." Qu

instructed Lin to find the right carrier so that all goods can be shipped at once and "the value of the goods can be falsified." Qu later reiterated that any carrier would be fine, so long as it would be possible to falsify the value of the items.

71. On May 21, 2004, instructions were sent from BRLE to Lin (addressed as "Mrs. Wen") to leave all items for which the quantity was less than 10 pieces off the shipping invoice. Additionally she was instructed to modify the prices of three items and to falsify the part number and price of another.

72. In addition to falsifying shipping invoices, Lin and Qu have specifically discussed other ways to avoid drawing attention to their export operation. On September 3, 2004, Qu and Lin spoke about shipping goods. Lin said that Zhou had told Lin to send two packages by UPS on the same day, as there were too many goods to ship in one box. Lin told Qu that was not a good idea to send two packages to the same address on the same day because it would arouse suspicion. Qu agreed and stated Zhou was mistaken to suggest that.

73. Similarly, whenever possible, Lin avoids answering questions about her export business. On July 16, 2004, Lin called UPS to arrange a shipment pick-up. Lin told the representative that the shipment is going to the PRC. The representative asked Lin if Lin would like the representative to review the documentation required for sending shipments to the China. Lin declined the representative's offer and replied that she has the documents.

74. On June 15, 2004, a U.S. company representative pressed Lin for information about her company. Lin resisted at first, but then admitted that her customer is in China. The representative asked if she was trying to avoid customs charges. Lin did not answer the question.

75. Lin has also informed Qu and Wen that it is becoming more difficult to obtain export

23

controlled commodities. On June 13, 2004, Lin wrote to Qu and Wang that another company representative had said that his/her company was tightening controls on exports and that destination information would be needed for doing business. Lin concluded that "it seems there will be more and more trouble ordering goods, especially those sensitive products."

### *Involvement and Direction Provided by Ning Wen*

76.     Investigation has shown that Ning Wen, in addition to being the owner of Wen Enterprises, is knowledgeable of Lin's and Wen Enterprises' activities and, when necessary, provides instructions and advice to his wife, Hailin Lin. While Wen was in China for his employment with the Manitowoc Company, Wen and Lin used the telephone to discuss the business operations of Wen Enterprises. These conversations, which have been translated from Mandarin, include:

     a.     On July 24, 2004, Lin informed Wen that she does not like dealing with Zhou, because Zhou is "troublesome" because she always wants to bargain. Lin then said that the previous week, when Zhou was out of the office, Wang wrote the fax and she is easier to deal with. Wen and Lin further discussed the business dealings and bargaining and Wen said, "You should not listen to her (Zhou) all the time and yield to her... Tell her 'If you don't send the money, I will not call back.'" Later Wen summarized what Lin's part in the business should be, stating, "You should do things that have value, that is to send over PO (purchase order), to receive goods, to pack, and to mail...All other activities are non-value added." Wen then specifically told Lin that price bargaining with Zhou is "non-value added" and that she should no longer bargain with Zhou.

     b.     On May 29, 2004, Lin told Wen that she had shipped items through UPS and

24

DHL that day. Wen asked if the money had been sent yet and Lin told him that $30,000 had been received the previous day.[7] Lin said it was not enough and Wen told her to ask them to send more. Lin said they were having difficulty sending money. Wen proposed that Qu put money in a Bank of China account and give Lin a Visa card from which she could take advances. Wen said that would mean Qu would have to trust her. Lin replied "We have been in business for many years, they should trust me." Wen also suggested that they [Qu and Wang] could put money in Hong Kong and then wire the money from there. Lin replied that sometimes they do send money from Hong Kong.

c.       On July 6, 2004, Wen told Lin he sent her an email.[8] Lin said she got it. Wen said he sent it to "Qu Jian Guo and others" and then that "Qu Jian Guo and Xiao Qing (Zhou) wrote back to me." Wen said Zhou had told him that "we usually won't ask you to purchase things if you have difficulties." Wen further said that Zhou had told him not to do it if they feel uncomfortable and to "never ever provide false information." Lin giggled as Wen reiterated that Zhou had said to never provide false information. Wen then stated that Qu "likes to mess things up" and that they "believe that they can do whatever they want in China."

d.       On July 24, 2004, Wen told Lin to contact Qu because Lin needed a break. Wen advised Lin to pretend to quit and then see what Qu would do. Wen said that Lin could

---

[7] Bank records reflect that Wen Enterprises had received $33,353.85 from China National Packaging Base Construction Co. on May 27, 2004.

[8] The email sent by Wen to Lin and Qu was a Chinese news story about the arrests in Newark, New Jersey, of several ethnic Chinese individuals for illegally exporting technology to the PRC.

25

reduce her workload gradually. Wen further advised Lin to say (to Qu), "Don't pile up the workload. (It's) no use. I will not do it. I can only do this much." Wen then said to Lin that she should cross off the items on the list that she will not do. Wen and Lin further discussed the matter, with Wen reiterating that Lin should quit gradually, but not suddenly. He told Lin that Qu will not attempt to find a replacement unless Lin actually decreases her production.

e.      On June 4, 2004, Lin told Wen that she had sent two boxes of goods today, one each via UPS and DHL. Wen asked if Lin's assistant Qing Qing could help for another day. Lin did not like that idea, so Wen suggested that the wife of one of his Manitowoc Company coworkers could help Lin. Lin did not like that idea either, stating that it was not good for Wen and Lin to be too close to one of Wen's coworkers and his family.

### *Involvement and Direction of Jian Guo Qu and Ruo Ling Wang*

77.      Investigation has shown that Qu and Wang are two of Lin's primary contacts at BRLE. Wang and Qu are two of the individuals (assisted by Zhou), who request price quotations, order parts, and arrange for payment of the exported commodities.

78.      Investigation has revealed that weekly faxes are sent from Lin addressed directly to Qu and Wang. Return faxes are also received from Qu, Wang, or Zhou. These faxes include price quotations, shipping questions or instructions, and other business related questions. An example of these faxes includes:

a.      On May 21, 2004, a fax was sent to Lin from Qu or Wang which states "Ask the rep to give a 'reasonable' price. Otherwise, it will be hard for the user to accept the change made by the factory."

26

b.    On June 11, 2004, Lin faxed Qu and Wang in reference to a part that was non-returnable. In that fax, she stated "Please emphasize this to the user because it's very problematic to return or change. The user has to think carefully before the order is placed."

79.    The substance of these faxes, as well as telephone conversations between Lin, Qu and Wang reveals that Qu provides direction to Lin regarding shipping of and payment for export controlled commodities. These conversations include:

a.    On July 15, 2004, Qu and Lin discussed falsifying shipping documents so as to avoid law enforcement detection. Qu told Lin not to write down every part number on the invoices for the shippers. Lin replied that every week, there are many items that she doesn't write down. Qu cautioned that there shouldn't be too many items left out though, because he is afraid that if the box is searched and there are numerous items not included on the invoice, it will "appear to be intentional rather than unintentional." Qu instructed Lin that she should leave out only those items that are easily overlooked if boxes are searched. Qu later cautioned Lin not to make the value around 2400 every time because after an extended period of time, "Customs will always find things that have a pattern and will cause us trouble."

b.    A fax recovered on April 28, 2004, from the trash at Lin and Wen's residence revealed instruction from Qu, signed as "Qu," to Lin, addressed as "Mrs. Wen." Qu instructed Lin to find the right carrier so that all goods can be shipped at once and "the value of the goods can be falsified." Qu later reiterated that, "as long as the goal of shipping items of the right value but falsifying the value of the items can be achieved, any

27

carrier is fine."

    c.      On June 7, 2004, Qu called Lin and told Lin that she need not worry about a problem with money. He explained that it was taking some time to transfer the money from the "standard account." He told Lin that if she had problems with funds, she could cancel orders or postpone delivery dates. Qu then stated that he will wire about $45,000 next week.

80.    The investigation to date has revealed that Wang is an engineer and is likely the individual who deals with Chinese buyers for the electronic components.

    a.      Wang's October 1993 and September 1996 travel visas reflect that she was in the United States on business. On her travel visas for both visits, Wang listed her occupation as engineer for the China Far East International Trading Company.

    b.      On June 16, 2004, Lin told Qu that it would not be possible to ship a particular user's part by the deadline he had listed in the fax. Qu then consulted with Wang; based on Qu and Wang's conversation, Qu told Lin to order the part anyway.

    c.      On August 27, 2004, Lin asked if Zhou was now handling all of the business. Zhou replied that Qu still handles some of the older customers and the bosses of the end-users.

    d.      On September 1, 2004, Lin and Wang discussed a future shipment. Lin told Wang that the "AD 7233" had not arrived yet. Wang stated that part was for one of her customers, and that there was no rush on it. Wang informed Lin that Zhou wanted this part sent out by letter mail, because "letters don't go through customs."

    e.      On August 12, 2004, Lin asked Wang whether a package she had sent by DHL

28

had arrived yet. Wang responded that it had not, but she expected it soon. Wang then informed Lin that the package Lin had sent out on Saturday by UPS had arrived on Tuesday.

81. In addition to their respective roles, it appears that Qu, Wang and Zhou will cover each other's workload when one or more of them is not in present at BRLE.

    a.    On July 15, 2004, Qu informed Lin that since Zhou was out of the office, he and Wang were handling the faxes.

    b.    On September 16, 2004 Zhou told Lin that since Qu and Wang have left [for the U.S. and Canada], she has to deal with everything by herself. Zhou also complained that she was being hurried by the research institutes.

### H.    MONEY LAUNDERING

82. As discussed above, after Lin would ship export controlled-commodities to Qu and Wang at BRLE, Lin would provide the false shipping invoice, as well as a real invoice to BRLE. The real invoice charged BRLE for the cost of items sold, which cost included an approximate 20% markup on the price which Lin had paid for the items. This markup was the profit to Lin, Wen, and Wen Enterprises.

83. In order to compensate Wen Enterprises for the costs of the electronic components, including controlled commodities which were sold, Qu arranged for money to be wired to the Wen Enterprises bank account, Associated Banc-Corp account number 2203003690,[9] from the

---

[9] On May 11, 2000, checking account number 2203003690 was opened at Associated Banc-Corp., Manitowoc, Wisconsin. This account is in the name of "Ning Wen D/B/A Wen Enterprises." A review of the signature card indicates that Hailin Lin is the designated agent for the account.

Case 1:04-cr-00241-WCG   Filed 09/28/04   Page 30 of 38   Document 1

bank accounts of one individual and one entity: Ms. Tsui Kan, Hong Kong, and China National Packaging Base Construction Co. Beijing, China.[10] Other than the fact that the Wen Enterprises' invoices reflect a credit to BRLE's account when these wire transfers are received, no association between either Ms. Tsui Kan or China National Packaging Base Construction Co. and BRLE has been established.

84.     A review of the deposit items and wire transaction records for this account from January 1, 2004 to August 11, 2004, indicates that the Wen Enterprises account at Associated Bank was the beneficiary of the following wire transfers:

| Wire Transfer Date | Wire Transfer Amount | Originator |
|---|---|---|
| 01/02/2004 | $ 29,967.10 | Ms. Tsui Kan |
| 01/20/2004 | $ 31,268.60 | China National Packaging Base Construction Co |
| 02/20/2004 | $ 58,587.70 | China National Packaging Base Construction Co |
| 03/03/2004 | $ 24,167.14 | Ms. Tsui Kan |
| 03/31/2004 | $ 41,243.10 | China National Packaging Base Construction Co |
| 04/30/2004 | $ 59,967.16 | Ms. Tsui Kan |
| 05/27/2004 | $ 33,353.85 | China National Packaging Base Construction Co |
| 06/16/2004 | $ 49,967.16 | Ms. Tsui Kan |
| 07/01/2004 | $ 17,267.00 | China National Packaging Base Construction Co |
| 07/28/2004 | $ 49,967.16 | Ms. Tsui Kan |
| 08/04/2004 | $ 49,967.16 | Ms. Tsui Kan |
| 08/11/2004 | $ 19,262.75 | China National Packaging Base Construction Co |
| | | |
| **Total** | **$464,985.88** | |

[10]Wire transaction records indicate Ms. Tsui Kan originator address is Flat A, 20/F, Empire Land Commercial Center, 81-85 Lockhart Road, Hong Kong. The originator bank is HSBC Hong Kong. Wire transaction records indicate China National Packaging Base Construction Company originator address is 3 Huapichang, Xicheng District, Beijing 100035, P.R. China. The originator bank is China Minsheng Bkg Corp Br, Beijing Branch, Beijing, China.

30

85.     These wire transfers, although not directly from BRLE, correlate with conversations between Lin and BRLE regarding payment for controlled commodities and other electronic components which have been shipped to BRLE. For example:

   a.      On June 7, 2004, Qu called Lin and told Lin that she need not worry about a problem with money. He explained that it was taking some time to transfer the money from the "standard account." He told Lin that if she had problems with funds, she could cancel orders or postpone delivery dates. Qu then stated that he will wire about $45,000 next week.

   b.      In a fax dated July 4, 2004, from Lin to BRLE, Lin confirmed that a payment of $17,267 had been received.

86.     Although Lin is primarily responsible for running Wen Enterprises, the investigation has revealed that Wen frequently questions Lin about the current financial status of the export business. For example:

   a.      On June 16, 2004, Wen asked if Qu had sent money and Lin replied that she had received $50,000 sent by Qu.[11]

   b.       On June 1, 2004, Wen asked Lin if Qu had sent the money yet and Lin responded that she had received the money.

87.     A review of checks paid from the Wen Enterprises checking account reveals that Lin used the money received from these wire transfers to continue purchasing and exporting controlled

---

[11] Bank records reflect that $49,967.16 was received from Ms Tsui Kan, Hong Kong, on June 16, 2004.

commodities. Lin used a computer to draft the checks to pay the electronics parts suppliers from whom she orders parts for export to the PRC.[12]

88.    A comparison of the above-described wire transfers with the knowing and willful export violations which are described *infra,* reveal that, in particular, the May 27, 2004, June 16, 2004, July 28, 2004, and August 11, 2004, wire transfers were made shortly after controlled commodities were illegally exported to BRLE.[13]   After those wire transfers, Lin used the money from the transfers to purchase additional controlled commodities, which were then exported to BRLE without obtaining the required export license from the Department of Commerce.

89.    In shipping the export controlled commodities, as well as the other electronic components to China, Lin, Wen, Qu, and Wang have earned substantial sums of money. The value of the Wen Enterprises bank account has increased by approximately $10,000 per month.  As of July 31, 2004, the balance in this account was $283,999.07.  In addition, Lin and Wen have transferred money from the Wen Enterprises bank account to other bank accounts in their possession, as well as to fund retirement accounts and purchase luxury vehicles and their home, currently valued at approximately $400,000.

90.    The following chart shows the monthly increase in the balance to the Wen Enterprises checking account:

---

[12]Copies of the checks to the U.S. suppliers and manufacturers reveal that they do not include any handwriting.  Instead the recipient, the amount and the date are all printed on the check.  The signature on the check is that of Ning Wen and is also computer-printed.

[13] The shipments occurred on May 1, 2004, May 30, 2004, June 6, 2004, June 13, 2004, July 27, 2004, August 9, 2004, and September 3, 2004.

| Monthly Statement Date | Deposits Wire Transfers | Checks Paid | Ending Balance |
|---|---|---|---|
| 01/01/2004 - 01/31/2004 | $ 61,235.70 | $ 35,432.72 | $ 232,135.11 |
| 02/01/2004 - 02/29/2004 | $ 58,587.70 | $ 25,305.82 | $ 264,521.26 |
| 03/01/2004 - 03/31/2004 | $ 65,410.24 | $ 51,596.00 | $ 274,327.12 |
| 04/01/2004 - 04/30/2004 | $ 59,967.16 | $ 58,283.57 | $ 272,116.13 |
| 05/01/2004 - 05/31/2004 | $ 33,353.85 | $ 37,419.99 | $ 263,365.51 |
| 06/01/2004 - 06/30/2004 | $ 49,967.16 | $ 47,723.43 | $ 257,090.52 |
| 07/01/2004 - 07/31/2004 | $ 67,234.16 | $ 31,917.14 | $ 283,999.07 |
| | | | |
| **Total** | **$395,755.97** | **$287,678.67** | |

91.     Investigation has determined that Wang and Qu likely have also made significant sums of

money by importing these commodities to China.  On August 17, 2004, Wen and Lin talked.

After mentioning tense relations between the PRC and Taiwan, Wen said, "China now is

desperately purchasing weapons . . . developing weapons." Lin agreed.  Wen then asked "How is

Qu Jian Guo's business?  Well if the war breaks out, his business will be booming." Lin

responded by laughing.  Lin and Wen then discussed that Qu has made a large amount of money

in the business and Lin said, "They have become rich in the last ten years quickly."

92.     In addition to the above-described Wen Enterprises bank account, investigation has

revealed that Lin and Wen rent a safe deposit box numbered 2779 located at Associated Bank,

1000 Franklin Street, Manitowoc Wisconsin.  Lin and Wen opened this box on November 4,

1999.  On November 16, 1999, January 11, 2002, March 4, 2003, and November 5, 2003, Lin

accessed this box alone.  On May 21, 2003, Lin and Wen accessed this box together.

## I.     PROBABLE CAUSE TO SEARCH OF THE SUBJECT PREMISES AND SAFE DEPOSIT BOX

93.     Based upon my training, experience and participation in other investigations, I know:

a.      Persons involved in export transactions subject to the EAR are required by Part 762 of the EAR (15 C.F.R. 762) to maintain export control documents and certain other records for a period of five years from the date of export. These export control documents and other records include, but are not limited to the documents as defined in Part 772 of the EAR (15 C.F.R. 772), such as: export license applications and related correspondence, air waybills, bills of lading, shipper's letters of instruction, end-user certificates, Shipper's Export Declarations, memoranda, notes, correspondence, contracts, invitations to bid, books of account, and financial records.

b.      Persons shipping USDOC controlled commodities often communicate by telephone, facsimile, mail and other means to facilitate their business.

c.      Persons shipping USDOC controlled commodities often use such financial methods as letters of credit, wire transfers, cash payments, cashiers checks, multiple bank accounts and other methods to conduct their business.

d.      Persons often maintain and/or create business documents on computer, particularly when there is a computer located on the business premises.

e.      Persons shipping USDOC controlled commodities may falsify documents to conceal the licensing and certification requirements of the U.S. Departments of Commerce, Treasury and State. These false documents include, but are not limited to, export control documents as defined in Part 772 of the EAR (15 C.F.R. 772), such as: export license applications and related correspondence, air waybills, bills of lading, shipper's letters of instruction, end-user certificates and Shipper's Export Declarations (SED).

34

f.    Persons shipping USDOC controlled commodities frequently maintain evidence

pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of

proceeds, such as currency, financial instruments, precious metals and gemstones,

jewelry, books, records, invoices, receipts, records of real estate transactions, bank

statements and related records, passbooks, money drafts, letters of credit, money orders,

bank drafts, cashiers checks, bank checks, and records of off-shore bank accounts. These

items are maintained by these persons within their residences, businesses or other

locations over which they maintain dominion and control.

94.    Based upon the information set forth above, permission is sought from this Court to

search the subject premises and to take the items described in Attachment A, including all

computer equipment and computer systems. The subject premises is the residence of Ning Wen

and Hailin Lin, as well as the business office of Wen Enterprises. As set forth herein, the

investigation has revealed that the subjects are using each of these subject premises in

furtherance of the specified federal offenses. Primarily, the materials sought from the subject

premises comprise the business and financial records of the subjects and the entities under their

control, including but not limited to Wen Enterprises. These items are likely to reflect the illegal

exporting, conspiracy, and money laundering violations detailed herein. In particular, the items

sought reflect the illegal business and financial activities of the subjects and are more particularly

described in Attachment A hereto.    In addition, permission is sought to seize any items which

are proceeds of the above-described illegal activity.

35

## J.     SPECIFIC INFORMATION REGARDING SEARCHING COMPUTERS

95.     Based upon training and experience, I know that searching and seizing information from computers often requires agents to seize most or all electronic storage devices (along with related peripherals) to be searched later by a qualified computer expert in a laboratory or other controlled environment. I believe this to be true based on the following facts which are outlined in attachment B to this affidavit.

## K.     CONCLUSION

96.     As a result of this investigative work and the information that I have reviewed and determined to be reliable, I submit:

a.     There is probable cause to believe that the subjects have committed and continue to commit the specified federal offenses.

b.     There is probable cause to believe that the subjects are using the subject premises in connection with the commission of the specified federal offenses.

c.     There is probable cause to believe that evidence or proceeds of the specified federal offenses might be found in the safe deposit box rented by Lin and Wen.

d.     There is probable cause to believe that the items sought in Attachment A of this Affidavit will be found in the subject premises or safe deposit box.

## L.     NECESSITY FOR SEIZURE WARRANT

97.     From my knowledge and experience as a law enforcement officer, I am aware that funds in bank accounts are highly liquid and can be moved and hidden easily. Furthermore, it appears that the Subjects have a sophisticated understanding of methods of moving money into and out of bank accounts, including wire and electronic transfers to other accounts. Therefore, I believe that

a protective order pursuant, whether in the form of a restraining order or an injunction, may not be sufficient to assure the availability of the property for forfeiture.

## M. SEALING OF AFFIDAVIT

98. It is respectfully submitted that this Court issue an Order sealing, until further order of this Court, all papers submitted in support of this Criminal Complaint, Search Warrant and Seizure Warrant, including the Applications, Affidavit, Search Warrant, Seizure Warrant, Criminal Complaint, and Arrest Warrants and the requisite inventory notices (with the exception of one copy of each warrant and inventory that will be left at the premises). Sealing is necessary because the items and information to be seized are relevant to an ongoing investigation. Premature disclosure of the contents of this Affidavit and related documents may have a negative impact on this continuing investigation and may jeopardize its effectiveness.

37